IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**C.O., a minor, and Pat
Oman, his parent,**
                        Case No. CV05-558-HU
                         (Lead Case)
                        Case No. CV 05-1715-HU

       Plaintiffs,

       v.                             **OPINION AND ORDER**

**Portland Public Schools,
et al.,**

       Defendants.


Pat Oman
4015 NE Multnomah Street
Portland, Oregon 97232
    Pro se

J. Michael Porter
Miller Nash
111 S.W. Fifth Avenue Suite 3400
Portland, Oregon 97204
    Attorney for Portland Public Schools

John Kroger
Attorney General
Kenneth C. Crowley
Senior Assistant Attorney General
Department of Justice 1162 Court Street NE
Salem, Oregon 97301
    Attorneys for Oregon Department of Education


OPINION AND ORDER Page 1

HUBEL, Magistrate Judge:

These are consolidated actions brought by plaintiff Pat Oman pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1487. Oman originally named as defendants Portland Public Schools (PPS), the PPS Board, Vicki Phillips, former PPS Superintendent, Graham Hicks, an attorney in private practice representing PPS, and Maxine Kilcrease, Theresa Middleton, Janet Wagner, Jack Ubik, Alana Coulter, Mary Mertz, and Constance Bull, individuals employed with PPS (collectively, PPS); the Oregon Department of Education (ODE), State Superintendent for Public Instruction Susan Castillo, Suzy Harris and Nancy Latini, individuals employed by the ODE (collectively, ODE); and Thomas Ewing and Deanna Hassanpour, administrative law judges (ALJs) of the ODE Office of Administrative Hearings (OAH). In previous rulings, the court dismissed some individual defendants (Graham Hicks, Ewing, and Hassanpour) and all of Oman's claims except for retaliation. The only remaining defendants for trial are PPS, Constance Bull, ODE, Nancy Latini and Suzy Harris.

## Procedural History of Case

The first of these consolidated actions, <u>C.O. and Pat Oman v. Portland Public Schools et al.</u>, CV 05-558-HU, originally asserted claims under IDEA; section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Titles II and IV of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213; federal civil rights statutes, 42

OPINION AND ORDER Page 2

U.S.C. §§ 1983 and 1985; Or. Rev. Stat. §§ 659.850, 659A.403, and 659A.142; and common law intentional infliction of emotional distress. Defendants filed a motion to dismiss. In an Opinion and Order entered December 22, 2005 (doc. # 31), the court dismissed without prejudice the claims asserted on behalf of C.O. because his mother, Pat Oman, as a non-lawyer could not represent him; dismissed with prejudice the claims based on § 504, ADA, Oregon Revised Statutes, and the common law; and gave Pat Oman leave to replead the IDEA and constitutional claims, on her own behalf. C.O. has never obtained counsel or refiled the claims asserted on his behalf.

Oman filed an amended complaint in CV 05-558-HU and a separate action, Pat Oman v. PPS et al., CV 05-1715-HU. The cases were consolidated. Defendants moved for judgment on the pleadings. In an Opinion and Order entered on November 7, 2006 (doc. # 76), the court dismissed the claims asserted under 42 U.S.C. § 1983 with prejudice, on the ground that such claims were precluded by the IDEA; ruled that money damages were not recoverable under the IDEA, see Robb v. Bethel Sch. Dist. # 403, 308 F.3d 1047, 1049(9th Cir. 2002), and held that Oman could not assert a claim for monetary relief under 42 U.S.C. § 1983 for alleged violations of the IDEA. Subsequent authority from the Ninth Circuit confirmed the court's holding that IDEA plaintiffs cannot assert claims under 42 U.S.C. § 1983 in order to recover monetary damages. Blanchard v. Morton

Sch. Dist., 509 F.3d 934, 937-38 (9th Cir. 2007).

Defendants subsequently filed motions for summary judgment. In an Opinion and Order entered September 10, 2007 (doc. # 144), the court held that Oman's IDEA retaliation claims were governed by the standard applicable to claims asserting interference with, restraint, or denial of the exercise or attempted exercise of rights provided by federal law. See Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1125 (9th Cir. 2001)(standard applied to claim under Family Medical Leave Act, 29 U.S.C. § 2615). The court held further that Oman had raised genuine issues of material fact on whether defendants retaliated against her for attempting to exercise her parental rights under IDEA.

Oman filed a motion requesting that the court reconsider its ruling of December 22, 2005, dismissing her claims under the ADA and Section 504, on the basis of Barker v. Riverside County Office of Education, 584 F.3d 821(9th Cir. 2009). The court reconsidered its decision, but adhered to its conclusion in an Opinion and Order entered December 18, 2009 (doc. # 174).

In light of issues raised by the defendants as the pretrial documents were being filed, the court entered an Opinion and Order on February 12, 2010 (doc. # 200) holding that Oman was entitled to pursue a claim for nominal damages for violation of an implied right not to be retaliated against for attempting to exercise procedural rights under the IDEA, and could similarly pursue a

OPINION AND ORDER Page 4

nominal damages award for the same alleged wrong under 42 U.S.C. § 1983 for violation of her parental rights provided by the IDEA.

### Standards and Legal Conclusions

The IDEA provides states with federal funds to help educate children with disabilities if the state provides every qualified child with a free appropriate public education (FAPE) that meets the federal statutory requirements. Amanda J. v. Clark County School Dist., 267 F.3d 877, 882(9th Cir. 2001). The IDEA abrogates the Eleventh Amendment immunity of states accepting the funds disbursed to them under the IDEA. 20 U.S.C. § 1403(a).

A disabled child's particular needs are addressed in an individualized education plan (IEP), which is specially created for that child through the collaborative efforts of the child's parents and teachers, the local educational agency, and, in appropriate cases, the child himself. 20 U.S.C. § 1414(d)(1)(B). The IDEA creates a "right, enforceable in federal court, to the free appropriate public education required by the statute." Smith v. Robinson, 468 U.S. 992, 1002 n. 6 (1984), *superseded by statute on other grounds by Pub. L. No. 99-372, 100 Stat. 796 (1986); accord,* Honig v. Doe, 484 U.S. 305, 310 (1988)(right to a FAPE is an "enforceable substantive right").

The procedural safeguards of the IDEA are set out at 20 U.S.C. § 1415. Procedural compliance is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide

OPINION AND ORDER Page 5

for meaningful parent participation are particularly important. Amanda J., 267 F.3d at 891. By mandating parental involvement and requiring that parents have full access to their child's records, Congress sought to ensure that the interests of the individual children were protected. Amanda J., 267 F.3d at 891.

Among the procedural rights guaranteed to parents by § 1415 of the IDEA are the right to examine all records relating to their child, to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a FAPE to the child. 20 U.S.C. § 1415(b)(1). Educational agencies must also establish procedures designed to assure that the notice required by 20 U.S.C. § 1415(b)(1)(C) "fully informs the parents ... of all procedures available pursuant to this section," 20 U.S.C. § 1415(b)(1)(D), and give parents "a copy of the procedural safeguards available to the parents of a child with a disability." 20 U.S.C. § 1415(d)(1).

Participating states are required to establish procedures giving parents "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). After making their complaints, parents are entitled to "an impartial due process hearing." Id. § 1415(f). A decision after the due process hearing "shall be final," id. § 1415(i)(1)(A),

OPINION AND ORDER Page 6

except that "[a]ny party aggrieved by the findings and decision ... shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States." Id. § 1415(i)(2)(A). These procedures, including the appeal, must be explained to parents in writing upon the filing of an administrative complaint. Id. § 1415(d).

Distinct from the IDEA's due process requirements, the United States Department of Education has promulgated regulations pursuant to its general rulemaking authority requiring each recipient of federal funds, including funds provided through the IDEA, to put in place a complaint resolution procedure (CRP). 34 C.F.R. §§ 300.660-300.662; Lucht v. Molalla River Sch. Dist., 225 F.3d 1023, 1029 (9th Cir. 2000). The regulations require each state education agency to adopt written procedures for resolving any complaint about the education of a child with a disability. 34 C.F.R. § 300.660(a). The regulations permit the filing of a complaint under either or both the CRP and the IDEA due process hearing schemes for dispute resolution. If both are pursued by a parent, the CRP complaint must await the due process hearing's resolution of overlapping issues, which is then conclusive as to the CRP complaint. Id. § 300.661(c). The regulations also provide that the CRP must resolve a complaint alleging a public agency's failure to implement a due process

decision. Id. § 300.661(c)(3). However, the regulations do not require that a parent exhaust the CRP to enforce a due process decision in court. Porter v. Board of Trustees of Manhattan Beach Unified Sch. Dist., 307 F.3d 1064, 1067 (9th Cir. 2002).

Under the IDEA, federal courts reviewing state administrative proceedings are to "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and "grant such relief as the court determines is appropriate" based on a preponderance of the evidence. Amanda J., 267 F.3d at 887, citing 20 U.S.C. § 1415(i)(2)(B).

In 2004, the IDEA was reauthorized as the Individuals with Disabilities Education Improvement Act of 2004 (IDEA 2004), Pub. L. No. 108-446, 118 Stat. 2647 (2004). IDEA 2004 amended, among other things, notification requirements for parents requesting due process hearings, and timelines, including a 30-day dispute resolution period before a due process hearing. It also instituted a procedure allowing the school district to challenge the sufficiency or specificity of a complaint. IDEA 2004 took effect July 1, 2005.

This court has held that Oman can assert a claim for retaliation under the IDEA despite the absence of an explicit provision authorizing such a claim. Authority for this holding is found in a line of Supreme Court cases finding an implied cause of action for retaliation in civil rights statutes. In Sullivan v.

Little Hunting Park, Inc., 396 U.S. 229, 237 (1969), a white person, Sullivan, rented his house to a black man, Freeman, and assigned Freeman a membership share in a corporation which permitted the owner to use a private park that the corporation controlled. The corporation refused to approve the share assignment and, when Sullivan protested, expelled Sullivan and took away his membership shares. Sullivan sued the corporation, and the Supreme Court upheld his claim, finding that the corporation's refusal to approve the assignment was "clearly an interference with Freeman's right to lease," 396 U.S. at 237, and that Sullivan had standing to assert the claim because permitting the corporation to punish Sullivan "for trying to vindicate the rights of minorities protected by [42 U.S.C. § 1982]" would perpetuate racial restrictions on property. Id. at 237. The court was not deterred by the absence of an explicit retaliation provision in § 1982.

In Jackson v. Birmingham Bd. of Ed., 544 U.S. 167, 176 (2005), the Court noted that the Sullivan court had interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition. On the basis of Sullivan, the Court held that Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), which prohibits sex discrimination in educational programs, authorized a claim for retaliation against a public school teacher for complaining about sex discrimination, despite the absence of the

OPINION AND ORDER Page 9

word "retaliation" in Title IX. The <u>Jackson</u> Court emphasized that under <u>Sullivan</u>, the white owner could "maintain his *own* private cause of action under § 1982 if he could show that he was punished for trying to vindicate the rights of minorities." 544 U.S. at 176, n. 1 (emphasis in original).

In <u>Gomez-Perez v. Potter</u>, 553 U.S. 474 (2008), the Court held that the federal-sector provision of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633a(a), reached a claim of retaliation after plaintiff filed an administrative ADEA complaint. And in <u>CBOCS West, Inc. v. Humphries</u>, 553 U.S. 442 (2008), decided the same day as <u>Gomez-Perez</u>, the Court held that a retaliation claim was cognizable under 42 U.S.C. § 1981 for any individual, regardless of race, who suffers retaliation because he has complained about race discrimination against another employee. The Court found the failure of § 1981 to provide an explicit anti-retaliation provision no barrier to its holding. 553 U.S. at 1959.

IDEA, like 42 U.S.C. §§ 1981, 1982, Title IX, and ADEA, is a civil rights statute. 20 U.S.C. § 1400; <u>Dellmuth v. Muth</u>, 491 U.S. 223, 227 n. 1 (1989)(precursor to IDEA enacted under Congressional authority granted by § 5 of the Fourteenth Amendment). Under the Supreme Court cases cited, I conclude that Oman can pursue a cause of action for retaliation under IDEA.

ODE has asserted jurisdictional defenses variously characterized as immunity under the Eleventh Amendment, sovereign

immunity, and the absence in the IDEA of a private right of action to challenge ODE's complaint resolution procedure.

ODE's Eleventh Amendment defense is not viable because the IDEA abrogates the Eleventh Amendment immunity of states accepting the funds disbursed to them under the IDEA. 20 U.S.C. § 1403(a). Oregon accepted funds. See Exhibit 823.

ODE asserts that sovereign immunity bars Oman from challenging in this court ODE's final order refusing to investigate her "systemic" complaint about reimbursement for the IEE. ODE argues that under 20 U.S.C. § 1412(a), which requires states to maintain policies and procedural safeguards for CRP complaints, Oregon was authorized to, and did, write regulations governing the CRP process. The Oregon regulations provide that complaints are concluded with an order from ODE, and that the appeals process for such orders is through state courts. ODE asserts that CRP complaints are governed by the Oregon Administrative Procedures Act's provision governing review of orders other than contested cases, Or. Rev. Stat. § 183.484, and that as a result, this court lacks jurisdiction to review the CRP complaint because Oregon has granted its own courts exclusive jurisdiction to review them.

The argument is based on OAR 581-015-2030(14), which provides that a party may seek judicial review of a complaint disposition under Or. Rev. Stat. § 183.484, by filing a petition with the Marion County Circuit Court or with the Circuit Court for the

OPINION AND ORDER Page 11

County where the party resides. ODE asserts that this administrative rule required Oman to challenge the ODE's final order in state court, so that she is now foreclosed from asserting a claim based on the CRP ruling in this court. The argument is unpersuasive.

Nothing in OAR 581-015-2030(14) itself suggests that Oman's remedy in state court is exclusive. The regulation merely provides that a party "may" seek judicial review of an order in state court. Nor can the IDEA's grant of authority to the state educational agency to promulgate administrative rules governing CRP complaints support the argument that sovereign immunity demands that the court defer to the state's right to define judicial review under the provisions of the IDEA. IDEA's grant of authority to the state educational agency, 20 U.S.C. § 1412(a), directs the state educational agency to "establish and maintain procedures *in accordance with this section,*" (emphasis added) and § 1412(a)(11)(A) provides that the state educational agency is responsible for ensuring that the requirements of § 1412 are met. The administrative rules of a state agency (promulgated under the authority of a federal statute, the IDEA) cannot override IDEA's grant of jurisdiction to federal courts. See 20 U.S.C. § 1415 (h)(2)(A)(aggrieved party has right to bring civil action in any state court of competent jurisdiction or federal district court) and § 1415 (h)(3)(A) (federal district courts "shall have

jurisdiction of actions brought under this section"). ODE's argument OAR 581-015-2030 operates to divest a federal court of jurisdiction is untenable under the Supremacy Clause, U.S. Const. art. VI § 2 and the constitutional grant of federal court jurisdiction in "all cases" arising under the laws of the United States. U.S. Const. art. III § 2. See, e.g., <u>Wisconsin Public Intervenor v. Mortier</u>, 501 U.S. 597 (1991)(state laws that interfere with, or are contrary to federal law are invalid under the Supremacy Clause; actual conflict arises when "compliance with both federal and state regulations is a physical impossibility" or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.")

More fundamentally, Congress waived the Eleventh Amendment for states accepting federal funds under the IDEA, and it gave disabled children and their parents the right to bring IDEA claims to federal district courts. There is no language in IDEA or any court decision cited to the court betraying any intent by Congress to delegate to the states the ability to divest this court of jurisdiction over appeals of CRP decisions. It would not make sense to do so. Access to federal court would not be left to piecemeal determination by state education departments. Further, the constitutional grant to Congress to determine the jurisdiction of federal courts makes it highly unlikely that Congress could delegate determination of federal court jurisdiction issues to

state agencies, even if it wanted to do so.

ODE also asserts that IDEA confers on Oman no private cause of action in this court to challenge ODE's disposition of her CRP complaint. ODE relies on <u>Virginia Office of Protection and Advocacy v. Virginia Dep't of Education</u>, 262 F. Supp. 2d 648 (E.D. Va. 2003)(holding that no private cause of action existed with respect to complaint resolution procedures decisions) and <u>Wachloarowicz v. Sch. Bd. of Independent Sch. Dist. No. 832</u>, 2004 WL 2237069 (D. Minn. Sept. 30, 2004). The court declines to follow the holdings of these cases. The <u>Virginia</u> case found no private right of action. However, that court never addressed the issue of whether Congress could or did delegate to a state agency the determination of the right to bring an action in federal court for those, like Oman, who claim they are aggrieved by a CRP decision. The Minnesota District Court simply followed the decision in <u>Virginia</u>. More importantly, the cases are in conflict with Ninth Circuit authority in <u>Lucht</u>, 225 F.3d at 1028-29 (holding that CRP and due process hearing procedures are "simply alternative (or even serial) means of addressing a § 1415(b)(6) complaint," and "no less a proceeding under § 1415 than is a due process hearing"). Further, the court in <u>Lucht</u> found a successful CRP complainant could apply to federal district court for an award of attorney's fees. This is a further indication Congress intended the CRP process to be reviewable in federal district court.

OPINION AND ORDER Page 14

Oman is clearly barred from asserting a § 1983 claim against ODE or its officials acting in their official capacity, because neither is a "person" for purposes of a § 1983 liability in an action for monetary relief. See, e.g., Lapides v. Board of Regents, 535 U.S. 613 (2002) and Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997).

PPS has no liability under § 1983 based on respondeat superior. Monell v. Dep't of Social Services, 436 U.S. 658, 692-94 (1978). PPS can be liable under § 1983 only when the actions plaintiff complains of constitute "execution of a government's policy or custom ... [that] inflicts the injury." Id. at 694. Oman has not attempted to prove that Bull's actions constituted execution of a PPS policy or custom, so Bull is the only party with potential liability under § 1983.

The Eleventh Amendment and the absence of respondeat superior liability or an allegation of policy or custom do not bar Oman's claim for retaliation in violation of IDEA against ODE, Latini, Harris, PPS and Bull. However, as the court has previously ruled, Oman cannot obtain monetary damages under IDEA, nor can she do so by asserting a § 1983 claim based on violation of the IDEA. See Robb, 308 F.3d at 1049(money damages not recoverable under IDEA) and Blanchard, 509 F.3d at 937-38 (plaintiff cannot assert a claim for monetary relief under 42 U.S.C. § 1983 for alleged violations of the IDEA).

OPINION AND ORDER Page 15

However, a claim for violation of civil rights can be redressed through an award of nominal damages when compensatory damages are not available, and this includes implied federal rights. See Bernhardt v. County of Los Angeles, 279 F.3d 862, (9th Cir. 2002)(plaintiff potentially entitled to nominal damages "on the basis that defendant's policy interfered with an implied federal right to obtain counsel in a civil rights action"); Rivera v. NIBCO, Inc., 364 F.3d 1057, 1069 (9th Cir. 2004)(nominal damages for Title VII violation); Draper v. Coombs, 792 F.2d 915, 921-22 (9th Cir. 1986)(permitting nominal damages in § 1983 action for violations of both statutory and constitutional rights); City of Riverside v. Rivera, 477 U.S. 561, 574 (1986)("Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms").

In Carey v. Piphus, 435 U.S. 247, 266 (1978)the Court held that "[b]y making the deprivation of [civil] rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed"). See also Cummings v. Connell, 402 F.3d 936, 945 (9th Cir. 2005)(nominal damages are not compensation for loss or injury, but rather recognition of a violation of rights.)

On the basis of this authority, I conclude that Oman can assert a claim for nominal damages for retaliation under IDEA

OPINION AND ORDER Page 16

against ODE, Latini, Harris, PPS, and Bull, and that she can assert a § 1983 claim for the same violation of IDEA against Bull, also seeking nominal damages. An award of nominal damages in this case does not defeat IDEA's comprehensive enforcement scheme, and furthers the goal of encouraging parent involvement. Parental involvement is a "fundamental component of the operation of the IDEA." Rueker v. Sommer, 567 F. Supp.2d 1276, 1286 (D. Or. 2008); see also 20 U.S.C. § 1415 (state educational agencies must establish and maintain procedural safeguards to ensure the parent is provided the opportunity to be fully involved in the educational services provided to their child).

The court has previously ruled that the appropriate analogy for Oman's retaliation claims under IDEA is the interference provision of the Family Medical Leave Act, 29 U.S.C. § 2615(a)(1). Such an interference claim requires the plaintiff to prove 1) that the plaintiff engaged in protected activity; 2) an adverse action; and 3) a causal relationship between the two. See, e.g., Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1125 (9th Cir. 2001). The court has adopted the standard of Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) in considering what constitutes an adverse action, and concluded that adverse action is conduct that reasonably likely to dissuade someone from engaging in protected activity.

///

OPINION AND ORDER Page 17

### Findings of Fact

Oman is the parent of C.O., a former student in PPS. As of the date of the trial, C.O. was over 21 years old. In third grade, C.O. was found eligible for special education services under IDEA. PPS provided such services to C.O. from third grade until his graduation from high school on June 2, 2006, with a modified diploma.

Defendant Constance Bull is an in-house special education attorney for PPS. She attended C.O.'s IEP meetings in 2004 and 2005. She also represented PPS in some of the due process hearings Oman requested, either in prehearing work, attendance at the hearing, or both.

Defendant Suzy Harris is an attorney, and, at all times relevant to these claims, was a special education legal specialist for ODE. Among other duties, she was responsible for investigating complaints against education agencies filed pursuant to the provisions of 34 CFR §§ 300.661 and 300.662, the CRP process.

Oman and PPS had a contentious relationship. Oman filed several CRP complaints with ODE challenging PPS practices toward C.O. See, e.g., Exhibits 3, 817, 818. Some of the complaints were substantiated, and others were not. Id. On March 16, 2004, Oman filed a request for a due process hearing with the Oregon Superintendent of Public Instruction, DP 04-110. The hearing request involved multiple issues, relating to C.O.'s April 2002

OPINION AND ORDER Page 18

IEP, Oman's access to C.O.'s educational records between April 2002 and March 2004, and the question of whether a confidentiality agreement could be a prerequisite to obtaining reimbursement for an independent educational evaluation (IEE) obtained for C.O. on March 26 and April 17, 2003.

Beginning April 1, 2004, Oman and Bull engaged in seven prehearing conferences with ALJ Betty Smith to try to identify and consolidate the various issues Oman had raised. On April 19, 2004, April 22, 2004, and April 24, 2004, Oman sent Bull a substantial list of issues to be addressed at the due process hearing. Exhibits 505, 506, 507. Over the summer of 2004, Bull and Oman also attempted to negotiate a settlement of the issues for the due process hearing, but failed.

Oregon's administrative procedures for contested case hearings provide that "[b]efore requesting a discovery order, a party or the agency must seek the discovery through an informal exchange of information." OAR 137-003-0570(1), Exhibit 11, p. 17. This implies a duty by the party and the school district to cooperate reasonably in informal discovery. On the petition of a party, the rules also allow the hearing officer to order the depositions of material witnesses. OAR 581-015-0085, Exhibit 11, p. 3. If a witness is unavailable for the hearing, the witness's testimony may be perpetuated by deposition. Id.

Essentially, Bull chose to not engage in informal discovery in

OPINION AND ORDER Page 19

any way for DP 04-110. After what Bull described as a summer of working aggressively to settle the issues involved in DP 04-110, it appears Bull was some combination of surprised, disappointed and frustrated that the efforts had failed and the hearing was going forward. At that point she changed her focus and took essentially three positions which are alleged to be retaliation for Oman's assertion of her parental rights under IDEA: (1) Bull declined to stipulate to any facts, until she was satisfied with the identification of the issues for the hearing, a subject which had been under discussion for months, (2) Bull declined to participate in any informal discovery, instead requiring Oman, a *pro se*, to file a motion for discovery with the ALJ and obtain an order form the ALJ before there would be any discovery, and (3) Bull refused to allow Oman to contact any PPS staff about any issue to be discussed at the due process hearing without arranging that with Bull, and allowing Bull to be present for the contact.[1]

I do not address the issue of Bull's refusal to enter into stipulations. Stipulations are something a party chooses to enter into voluntarily. While the Rules of Professional Conduct forbid attorneys representing parties from taking frivolous positions, the

---

[1] The court is mindful that C.O. was at that time a student of PPS requiring a yearly IEP, a document that parents, teachers and staff are expected to develop and implement together. While it might appear that Bull's position would interfere with that process, Bull and Oman testified at trial that Oman was not required to have Bull present for IEP-related meetings with PPS staff.

court's attention has not been drawn to any particular stipulation for which a refusal to agree would be frivolous on Bull's part.

I address witness contact restrictions next and return to discovery generally later. At the April 23, 2004, prehearing conference, in response to ALJ Smith's request that Bull explain why she had a problem with Oman contacting witnesses, Bull told Oman that she would have to go through Bull to do so, and "even when I get back to you, you still don't have access to my staff." The recording of this statement was played at trial. The tone and content would lead a reasonable parent to believe she was never going to be able to discuss the issues with PPS staff before the hearing unless the ALJ ordered it over Bull's objection.

At other times, Bull had a different description of her demands with respect to Oman's contact with witnesses. At the September 1, 2004 prehearing conference, Bull told ALJ Smith and Oman she was "going to direct staff to not speak to Oman about any of these issues and I just think [Ms. Oman] needs to know that right now because if we are now changing our focus if we are going to a hearing, my focus is completely different than it would be if we were in settlement mode." But at trial, Bull testified that she merely told PPS staff they did not have to speak to Oman, or that Oman would have to go through Bull to do so.

Also at the September 1, 2004 prehearing conference, Bull told ALJ Smith and Oman that if Oman wanted anything in the way of

OPINION AND ORDER Page 21

discovery, she would have to seek and obtain a discovery order from the ALJ. Bull confirmed in her trial testimony that this was her position on discovery. Based on the testimony of ALJ Smith and the excerpts of the audio recording of the prehearing conferences played during trial, I find that ALJ Smith played a passive role in managing what the ALJ herself described as "a clearly difficult relationship" between Oman and Bull. While the ALJ described Bull's conduct as professional, it could hardly have been less cooperative in facilitating the hearing preparation of Oman, a pro se parent, with a long list of issues she sought to resolve in the due process hearing.

Bull and PPS trial counsel, Mr. Porter, describe Bull's conduct as what any lawyer would do to "manage litigation." However, it is not appropriate for an attorney to deny any and all discovery before he or she even knows what discovery is or will be requested. Attorneys in Oregon are subject to the Rules of Professional Conduct.

Rule 3.4 Fairness to Opposing Party and Counsel

> A lawyer shall not:
>
> > ...
> > (d) in pretrial procedure, knowingly make a frivolous discovery request or *fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party*;
> > ...

Oregon Rules of Professional Conduct 3.4(d)(emphasis added).

OPINION AND ORDER Page 22

At all times that she was acting for PPS, Bull was an active member of the Oregon State Bar. Government lawyers like Bull are bound by the Rules of Professional Conduct. In re Roger Rook, 276 Or. 695, 701-02, 556 P.2d 1351 (1976), In re Gustafson, 333 Or. 468, 41 P.3d 1063 (2002). Without getting into the particulars of which witnesses were involved in Bull's direction to staff to not speak to Oman "about any of these issues", and whether these witnesses were appropriate for Bull, as PPS counsel, to claim she represented in an attorney client relationship, it is clear that Bull was going far beyond merely managing the litigation.

In addition to the Rules of Professional Conduct, the rules governing due process hearings, discussed above, require more cooperation than Bull gave to Oman. As soon as settlement negotiations broke down, Bull announced at a prehearing conference that she would not provide any informal discovery to Oman and that any discovery would require Oman to obtain an order from ALJ Smith to PPS to provide it. ALJ Smith did order some discovery (up to 30 requests for admission and up to 25 interrogatories). Exhibit 522.

PPS filed two motions to dismiss. ALJ Smith issued a Ruling on Motion to Dismiss Specific Issues on June 24, 2004, and this was followed by the issuance of a Second Amended Notice of Hearing and Rights, setting out the issues to be resolved at the hearing. ALJ Smith entered a Third Amended Notice on November 2, 2004. Exhibit 523.

OPINION AND ORDER Page 23

DP 04-110 was heard by ALJ Smith over a period of seven days in November and December 2004.

On March 17, 2005, Oman filed a CRP complaint on the IEE issue. Exhibit 2. Oman's complaint was based on PPS's requirement that she enter into a confidentiality agreement before being reimbursed for an IEE, and also on an allegation that PPS routinely required such confidentiality agreements. Harris testified that Oman failed to provide sufficient information to justify an investigation into whether the practice was "systemic" rather than directed at Oman as an individual, but acknowledged that no request for further information was made to Oman, although administrative regulations provided for such requests.

On March 31, 2005, ALJ Smith entered a corrected final order. Exhibit 800. The ALJ concluded that PPS had provided C.O. a FAPE, but that PPS had not complied with its obligation to provide Oman with all of C.O.'s records in a timely fashion, and that PPS had not demonstrated how much math instruction C.O. had received. The ALJ ordered PPS to provide training to PPS staff on, among other things, how to respond to records requests, and to provide C.O. with 4000 minutes of compensatory math education, "to be provided in the summer of 2005 or, if the parents and district agree, at another time." The ALJ also found in Oman's favor on reimbursement for the IEE and held that PPS did not have the right to require Oman to execute a confidentiality agreement as a condition of

OPINION AND ORDER Page 24

reimbursement.

On April 4, 2005, ODE dismissed Oman's IEE complaint, filed on March 17, 2005, on the ground that the issue had been addressed in DP 04-110, so that the ODE did not have jurisdiction to investigate it. Exhibit 3.

On April 5, 2005, Oman filed another request for a due process hearing, DP 05-106, based on C.O.'s 2003 IEP.  Exhibit 4. ALJ Bernadette House was assigned the case. On May 25, 2005, Oman filed a motion to include 16 additional issues in DP 05-106, including the question of whether PPS should be removed from all aspects of C.O.'s education because of a pattern of retaliation against his parents. Exhibit 19. The ALJ denied the motion. The hearing in DP 05-106 lasted four days. On October 7, 2005, ALJ House determined that PPS had failed to provide Oman access to all of C.O.'s records, but the failure did not prevent Oman from participating in the 2003 IEP. House concluded that PPS had met its obligations to C.O. No relief was ordered.

On June 28, 2005, Oman requested another due process hearing, which was designated DP 05-116. Exhibits 825, 826. The request was received by ODE on July 5, 2005, and faxed to the Office of Administrative Hearings (OAH) on July 7, 2005. On July 6, 2005, ODE sent Oman a letter informing her that the IDEA's 2004 amendments had taken effect on July 1, 2005, and enclosing a notice of procedural safeguards dated July 2005, Oregon Administrative Rules

OPINION AND ORDER Page 25

on due process hearings, and information about mediation. Exhibits 826, 827. On July 11, 2005, OAH sent Oman a letter confirming her due process request and referring to the new timelines created by IDEA 2004. Exhibit 832. At trial, Oman acknowledged that she had received these notices, though she had overlooked them at the time.

On May 4, 2005, ODE had prepared a draft document setting out the new due process notice requirements and the new timelines. Exhibit 820. The draft noted that it was "[s]ubject to revision." Id. Harris testified that the draft "would have been posted on [ODE's] website," but could not recall whether it was posted before July 1, 2005. Harris testified further that it was ODE's practice to include the information in the packet of information ODE sent out to parties requesting a due process hearing. See Exhibit 827 (notice of procedural rights). Similarly, a model due process hearing request, reflecting the 2004 amendments, was posted on ODE's website in July 2005. Exhibit 829.[2]

PPS moved to dismiss DP 05-116 because Oman's request did not with the requirements of IDEA 2004 governing the contents of a due process request. On July 20, 2005, DP 05-116 was dismissed, on the ground that Oman's request contained insufficient descriptions of the nature of the problem and the facts leading to the problem, and lacked a proposed resolution of the problem. Exhibit 13. The order

---

[2] Federal regulations implementing IDEA 2004 were not adopted until October 13, 2006. Oregon did not file state administrative rules implementing IDEA 2004 until April 25, 2007.

stated on its face that Oman's request for due process hearing had been received by ODE on July 18, 2005, id., which was incorrect, the request having actually been received July 5, 2005. Exhibit 825.

The day of the dismissal order, July 20, 2005, Oman sent an e-mail to Harris requesting information about the new procedures under the 2004 amendments to the IDEA. Exhibit 836. On July 21, 2005, Andrew Logerwell, the attorney representing ODE in CV05-558-HU, told Oman by e-mail that a discovery request for production of documents would be necessary in order to obtain that information. Id.

Meanwhile, Oman and Bull had corresponded and conversed over the phone through the summer of 2005, attempting to schedule a time and place for the compensatory math education ordered by the ALJ in DP 04-110. In April 2005, Bull sent Oman an email asking to discuss "how we can provide" the math instruction "by the end of the summer," and asking for her "thoughts on this." Exhibit 526. Oman and Bull eventually scheduled a telephone conference, on May 17, 2005. Exhibit 527. According to Bull's notes, Oman's preference was to enroll C.O. in the Melvin-Smith Learning Center in California, where C.O. had gone in 2003. Id. Oman acknowledged that the program was expensive, and they discussed having PPS and Oman divide the cost. Id. Bull also wrote, "Alternatives I suggested: I told her I would agree to not doing it this summer, but [illegible] the fall."

OPINION AND ORDER Page 27

<u>Id.</u> Bull and Oman sent e-mails back and forth in late June and early July 2005, about Melvin-Smith's charges and possible scheduling of a program at Melvin-Smith. Exhibits 532, 533, 534. On July 1, 2005, Bull sent an e-mail to Oman saying she had spoken to staff at Melvin-Smith "in general terms," and proposed a three week intensive program there which, because its cost was greater than the cost of a tutor, would constitute "complete satisfaction" of the compensatory education hours owed to C.O. Alternatively, Bull wrote, PPS was willing to provide 67 hours of math instruction at the Sylvan Learning Center "this summer or in the fall." Exhibit 534. Bull wrote again on July 27, 2005:

> The Final Order states that these services must be provided in the summer or another time if the District and parent agree. The District has attempted to work with you to provide the services this summer, but you have not contacted me so that this could be accomplished. Your last email to me was July 12, 2005, in which you stated that you were interested in having [C.O.] receive the services in Sacramento and that you would get back to me in a couple of days. I have heard nothing from you since that date. At this time, the District does not agree to provide the services at any time other than this summer.

Exhibit 538.

On September 15, 2005, Oman wrote a letter to Lauretta Manning, a PPS administrator, saying she had tried to get C.O. in for tutoring at the Melvin-Smith Learning Center over the summer, but nothing was available. Exhibit 14. Oman said the Melvin-Smith people had suggested the fall or winter, when their schedule was more open, or the following summer. <u>Id.</u> Oman asked whether the

OPINION AND ORDER Page 28

school district had any objection to either option, and asked
Manning to forward her letter to whoever was "the right person to
ask." Id. She added, "If I don't hear back from you by September
20, I'll assume that no reply will be forthcoming." Id. The letter
was copied to Bull and Harris. Id. Bull did not respond to this
letter.

On September 14, 2005, PPS had sent a letter to Harris at ODE,
copied to Oman, making a "final offer" to provide the compensatory
education at Sylvan Learning Center by October 15, 2005.

On October 5, 2005, Harris wrote an e-mail to Bull about the
September 15, 2005 letter PPS had sent to her. Harris said, "I'm
assuming the district is sticking with the position outlined in
your September 14 letter (Sylvan Learning Center, to begin by
October 15.) Is my assumption correct?" Exhibit 804. Bull
responded, "We have not received any other communication from the
parent since the parent's Sept. 15 letter to Lauretta Manning. ...
You are correct about the District's position. We are not willing
to wait until next summer to do the comp. ed. ... We have not
written the parent another letter to address her recent Melvin-
Smith request. I will ask Lauretta to ... tell her that we object
to that and stand by what we wrote in our September 14, 2005 letter
to you." Id.

On November 4, 2005, Harris wrote a letter stating that PPS
had satisfied the ALJ's order in DP 04-110 by offering the

OPINION AND ORDER Page 29

services, although none had actually been provided. Exhibit 17.

Oman filed another due process request on June 2, 2006, DP 06-116. PPS moved to dismiss DP 06-116 for failure to comply with notification requirements of IDEA 2004. ALJ David Gerstenfeld dismissed DP 06-116. After that time, Oman made no further attempts to pursue her parental rights under the IDEA, other than pursuing the actions filed in this court.

On July 15, 2005, Oman requested that ODE file the administrative record for DP 04-110 in this court. Exhibit 838. Harris requested the administrative record from the OAH on July 26, 2005. Exhibit 841. On October 10, 2005, Harris sent a letter to Logerwell informing him that OAH had not produced the record. Exhibit 842. Logerwell advised ODE on October 18, 2005, that OAH was not obliged to produce the administrative record because Oman "isn't asking for a review of our determination." Exhibit 844.

By letter dated October 28, 2005, Harris informed Oman that ODE would not forward the administrative record for DP 04-110 to the court and that ODE had cancelled the request to the Oregon OAH for the preparation of the administrative record. Exhibit 846. The letter was written on the basis of Logerwell's advice. I find that Harris acted pursuant to Logerwell's instructions, however erroneous they were, and Harris did not act in retaliation against Oman by failing to make a timely filing of the administrative record.

<u>                          </u><u>**Application of Law to Facts**</u>

1.    <u>ODE</u>

The retaliatory acts Oman alleges against ODE, through Harris and Latini, are 1) failure to investigate Oman's CRP complaint about PPS's requiring a confidentiality agreement before reimbursing her for an IEE, 2) failure to provide Oman with adequate notices of procedural safeguards based on IDEA 2004, and 3) failure to make a timely filing in this court of the administrative record.

ODE's failure to investigate the complaint is based on 1) the conclusion contained in the ODE Final Order signed by Latini that the matter was part of DP 04-110, so that ODE would defer to the ALJ; and 2) Harris's conclusion that Oman had failed to provide sufficient information substantiating the systemic nature of the complaint. Harris failed to request additional information from Oman, or Oman's attorney at the time, Dana Taylor, to determine whether there was a possible systemic problem as provided by regulations governing the CRP process.

The evidence does not establish that Harris's failure to investigate Oman's complaint or request additional information had a retaliatory motive. Harris conceded at trial that she did not request additional information from Oman or Taylor, as provided by state regulations. I find, however, that these failures, while erroneous, were not part of a course of action involving an intent

OPINION AND ORDER Page 31

to retaliate against Oman. Moreover, in the end, Harris's errors caused no harm to Oman. As ALJ Smith found, 1) Oman did not sign a confidentiality agreement, 2) Oman did get reimbursed for the IEE, and 3) ALJ Smith admonished PPS that it had no right to require a confidentiality agreement as a condition of IEE reimbursement. While Oman would apparently have preferred a stronger admonition from ALJ Smith, in reviewing ALJ's Smith's final order, I find no legal error in the wording she used.

Oman acknowledged at trial that she received a copy of Exhibit 827, thereby conceding that ODE did not fail to provide her with adequate notices of procedural safeguards based on IDEA 2004.

With respect to the failure to produce the administrative record in a timely manner, ODE relies on a defense of good-faith reliance on the advice of counsel. This defense has three elements. First, the litigant must demonstrate that he or she sought counsel's advice in good faith. The good-faith element of the defense requires that a defendant consult with an attorney with the purpose of being advised of the law. Drake v. Anderson, 215 Or. 291 (1959). Second, the defendant must disclose all material facts to his or her attorney. In general, the defendant need not communicate every detail to the attorney, but only those facts which are material to the question involved in the litigation. Counsel must advise the client on the course of conduct ultimately taken. U.S. v. Biship, 291 F.3d 1100, 1107 (9th Cir. 2002). Third,

defendant's actions pursuant to counsel's advice must be undertaken in good faith.

I conclude that all three elements are met here. Harris's testimony establishes that she sought Logerwell's advice in good faith, that she disclosed all material facts to Logerwell, and that although Harris seemed to question the appropriateness of Logerwell's advice, she did take it. Accordingly, ODE's failure to timely file the administrative record is excused by Harris's reliance on the advice of its counsel, Andrew Logerwell.

Latini's only role in these alleged retaliatory acts was to sign an order prepared by Harris. As Harris did not retaliate against Oman, it follows that Latini did not either.

2. PPS

The retaliatory acts Oman alleges against Bull are 1) her refusal to engage in any informal discovery in advance of the hearing in DP 04-110, and 2) her prohibition or obstruction of Oman's contacting any PPS staff in advance of the hearing, thereby hindering Oman's exercise of her procedural rights under the IDEA.

I find that Bull's actions outlined above in the Findings of Fact, with respect to discovery generally and witness contact specifically, were taken in retaliation for Oman's decision to pursue to hearing her parental right to advocate for C.O.'s educational rights. I further find that these actions were intended

to and did deter Oman from asserting her rights. While Oman moved forward with DP 04-110 and DP 05-106, she testified that in the end, she stopped participating in IEP development for her son, and did not amend the due process requests in 2005 and 2006 after PPS moved to dismiss them.

A question to be addressed here is whether Bull's actions as an in-house attorney for PPS can subject PPS to liability for retaliating against Oman as well. I have been presented with no authority for the proposition that the factfinder is precluded from finding PPS, Bull's employer, liable for Bull's actions. Perhaps actions within the Rules of Professional Conduct and within the implied requirements of the due process hearing regulations, however uncooperative they might be, cannot be found retaliative. But I conclude that when an in-house attorney for a school district steps beyond the Rules of Professional Conduct, with blanket refusals to provide discovery before knowing what is requested, and when the attorney does so immediately after a pro se party decides to pursue her rights rather than settle, whatever protection the attorney might have for conduct within the rules evaporates.

I conclude that Oman has proven by a preponderance of the evidence that Bull retaliated against her for engaging in activity protected by the IDEA, and that Bull's conduct in relation to preparation for the hearing in DP 04-110 was likely to deter a reasonable person, and did eventually deter Oman, from engaging in

OPINION AND ORDER Page 34

activity protected by the IDEA, including representing her child at a due process hearing and obtaining PPS compliance with the ALJ's order that PPS provide C.O. with compensatory instruction. Eventually, Oman gave up on IEP development for her son, and did not go forward after requests for due process hearings were dismissed. As such I conclude that PPS and Bull violated Oman's rights under IDEA, subjecting both Bull and PPS to a nominal damages award under IDEA. This same conduct results in a nominal damages award against Bull and PPS under § 1983.

### Decision

Accordingly, I award Oman the sum of $1.00 as nominal damages, payable by Constance Bull and PPS.

IT IS SO ORDERED.

Dated this 31st  day of March, 2010.

/s/

_____
Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

OPINION AND ORDER Page 35